# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00749-CV

---

**Hubert "Bud" Kott, Appellant**

**v.**

**Brian T. Miller and MK Developers L.C., Appellees**

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY**
**NO. 21DCV329000, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Hubert "Bud" Kott appeals from the trial court's judgment in favor of appellees Brian T. Miller and MK Developers L.C. regarding certain real estate transactions. By two related issues, Kott contends that the trial court erred in determining, after a bench trial, that the $350,000 promissory note executed in his favor and secured by MK Developers' Pet Hotel property was void. Because we conclude that Kott failed to meet his burden to demonstrate that the transaction was "fair" to MK Developers, as that term is used in Section 101.255 of the Business Organizations Code, we affirm the trial court's judgment.

# I.    BACKGROUND[1]

In 2005, Miller and Kott, then neighbors and friends, created MK Developers to invest in certain real estate.  MK Developers' regulations established it as a limited liability company and provided that the parties were both members with a 50% interest in the company. The regulations further provided that each member would be entitled to maintain a capital account which would increase in value when that member contributed money directly to MK Developers.  The parties were generally obligated to contribute money to the company from time to time, as needed by the company and in proportion to their respective membership interests.  The regulations further provided that MK Developers "may transact business with any Member, officer or Affiliate thereof, provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties."

Miller described his and Kott's respective roles in the company as follows:  Kott "would do all the accounting, he would pick out the property, and then he would consult" with Miller to determine whether to "go through a transaction or not."  Miller also testified that Kott "was responsible for all the payments, bills, and everything."  Over the years, MK Developers owned approximately twelve different properties.  As is relevant here, the parties began investing in a project called "the Pet Hotel" in 2009.  This business venture came about because Kott "wanted to build a hotel for animals when people went out of town, which was common in the Fort Hood area . . . .  And he thought it was a good business thing to invest in." Miller testified, "The Pet Hotel was part of the MK [Developers], always was."

---

[1] We derive this background from the testimony and evidence admitted at the final bench trial.

In July 2010, Miller suffered a stroke. He was in and out of treatment facilities until May 2011, when he returned to his "home across the street from . . . Kott." On September 1, 2011, Kott unilaterally executed two promissory notes. The first one, and the one at issue in this case, was a loan from Kott in his individual capacity to MK Developers in the amount of $350,000 and secured by a future interest in the Pet Hotel. The note reflects, in Kott's handwriting, that Miller authorized the note on behalf of MK Developers. However, the note also states that Miller was "unable to sign due to physical imparity (stroke)." The second note was in the amount of $50,000 and made payable by MK Developers to Miller. This note, also executed in Kott's handwriting, reflects that Miller authorized this transaction but, according to Kott, was "unable to sign." Both notes bore interest in the amount of 4% per annum.

Kott acknowledged at trial that he was the one who listed Miller's name on both notes. Kott could not recall whether he had any direct contact with Miller, his neighbor across the street, for approximately four months from May 2011 through the date of the notes. Kott testified, without specifying any date, that he attempted to discuss the notes with Miller by visiting Miller's home. However, he recalled that Miller's wife[2] turned him away and allegedly stated that Miller "was incapable of signing any documents." He further testified that he informed Miller of the existence of the $350,000 note "[a]t one time" but did not provide an approximate date for when this discussion occurred. For his part, Miller testified that he had no knowledge of the $350,000 promissory note at the time it was executed and did not learn of its existence until much later. He further testified that the statement in the notes reflecting that Miller was "unable to sign," was "not a true statement," as he had recuperated significantly from his stroke by the time he returned to his home in May 2011.

---

[2] Miller's wife was not called as a witness by either party at trial.

Kott testified that the total of $400,000 in loaned funds to MK Developers was necessary for the construction of the Pet Hotel. However, Kott acknowledged that when he was initially attempting to secure funding from independent financial institutions, he estimated the cost of the Pet Hotel's construction as $285,000. Kott further testified that the difference in the loaned amounts—$350,000 from Kott versus $50,000 from Miller—was necessary to balance the parties' respective capital contributions, which were disparate at the time.

In 2017, Kott pleaded guilty to "Misappropriation of Fiduciary Trust and Theft of Funds" after embezzling from his employer, 195 Lumber, where he worked as a bookkeeper handling the company's accounting. As part of his sentence, Kott was ordered to pay $2 million in restitution. MK Developers' bank records were admitted into evidence and confirm Kott's testimony that "a big part" of the amount ordered in restitution involved invoices charged to MK Developers that Kott inaccurately reflected in the company's records as having paid off himself. Kott described the scheme as follows:

> Q.     [Y]ou would have an invoice from 195 Lumber, and you would record it in MK's books as if you paid it?
>
> A.     As if I paid it, yes, I did. Yes.
>
> Q.     And that amount would then show on the books initially to increase your capital account?
>
> A.     That's correct.
>
> Q.     And the portion of your capital account that you claim you transferred into [the $350,000] note, you have charged interest on, correct?
>
> A.     That's correct.[3]

---

[3] Kott acknowledged that he accessed and modified 195 Lumber's payment records on accounts receivable, making unpaid invoices seem paid by using "a fictitious check."

In January 2018 and as part of Kott's restitution, Miller purchased Kott's interest in MK Developers in exchange for $350,000.[4] Miller testified that as of the date of this sale, he was still unaware of the outstanding $350,000 promissory note and "never would have" purchased Kott's shares for that amount if he had known of its existence.

Miller testified that he learned of the existence of the $350,000 promissory note after he attempted to sell another of MK Developers' properties and asked Kott to sign documents relinquishing any ownership interest he may have to that property. Instead of signing, Kott demanded full repayment of the $350,000 promissory note.

Both parties sought adjudication of the validity of the $350,000 note, among other things. In its final judgment, the trial court concluded that the "Standard Promissory Note dated September 1, 2011, in the principal amount of $350,000.00, with MK Developers L.C. as the maker and . . . Kott as payee, is void and has no legal effect." This appeal followed.

## II.    VALIDITY OF $350,000 NOTE

Kott argues that the trial court erred in determining that the $350,000 note was void because:  (1) Kott had authority to unilaterally execute promissory notes on behalf of MK Developers, and (2) Miller and/or MK Developers ratified the note.

## A.    Standard of Review & Applicable Law

Although members of limited liability companies ordinarily do not owe one another formal fiduciary duties, they do owe fiduciary duties to the company itself. *Bertucci v. Watkins*, 709 S.W.3d 534, 545 (Tex. 2025); *Dunster Live, LLC v. LoneStar Logos Mgmt. Co.*,

---

[4] Following this sale, Miller owned 99% of MK Developers' shares, and a woman named Geralyn J. Hall owned 1%.

No. 03-22-00014-CV, 2024 WL 291403, at *8 (Tex. App.—Austin Jan. 26, 2024, no pet.) (mem. op.) (citing *Ritchie v. Rupe*, 443 S.W.3d 856, 890 n.62 (Tex. 2014)). Among these duties, fiduciaries generally owe their principal the duty to "refrain from self-dealing." *Wolf v. Ramirez*, 622 S.W.3d 126, 142 (Tex. App.—El Paso 2020, no pet.); *Dandachli v. Active Motorwerks, Inc.*, No. 03-19-00494-CV, 2021 WL 3118437, at *5. (Tex. App.—Austin July 23, 2021, no pet.) (mem. op.).

"[W]hether a particular agreement is an enforceable contract is generally a question of law." *Meru v. Huerta*, 136 S.W.3d 383, 390 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.); *Naumann v. Johnson*, No. 03-19-00380-CV, 2021 WL 2212725, at *3 (Tex. App.—Austin June 1, 2021, no pet.) (mem. op.). However, when, as here, a party alleges that a transaction was created as part of a fiduciary's self-dealing, our analysis changes. *See Cluck v. Mecom*, 401 S.W.3d 110, 114 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). A contract between a limited liability company and one of its governing persons or officers is not void or voidable under certain circumstances, including if the contract is "fair to the company":

> An otherwise valid and enforceable contract or transaction described by Subsection (a) is valid and enforceable, and is not void or voidable, notwithstanding any relationship or interest described by Subsection (a), if any one of the following conditions is satisfied:
>
> > (1) the material facts as to the relationship or interest described by Subsection (a) and as to the contract or transaction are disclosed to or known by:
> >
> > > (A) the company's governing authority or a committee of the governing authority and the governing authority or committee in good faith authorizes the contract or transaction by the approval of the majority of the disinterested governing persons or committee members, regardless of whether the disinterested governing persons or committee members constitute a quorum; or
> > >
> > > (B) the members of the company, and the members in good faith approve the contract or transaction by vote of the members; or

> (2) the contract or transaction is fair to the company when the contract or transaction is authorized, approved, or ratified by the governing authority, a committee of the governing authority, or the members of the company.

Tex. Bus. Orgs. Code § 101.255(b); *see In re Estate of Poe*, 648 S.W.3d 277, 290 (Tex. 2022) (analyzing analogous Business Organizations Code Section 21.418, which applies to for-profit corporations); *Twenty First Century Holdings, Inc. v. Precision Geothermal Drilling, L.L.C.*, No. 03-13-0081-CV, 2015 WL 1882267, at *6 (Tex. App.—Austin Apr. 23, 2015, no pet.) (mem. op.) (construing safe-harbor provisions in Section 101.255 of the Business Organizations Code). It is the interested governing person that bears the burden of proving that these conditions are met. *See In re Estate of Poe*, 648 S.W.3d at 290 (citing Tex. Bus. Orgs. Code § 21.418).

Whether a self-dealing transaction is considered void or voidable is analyzed under the familiar sufficiency-of-the-evidence standards of review. *See In re Estate of Miller*, 446 S.W.3d 445, 452 (Tex. App.—Tyler 2014, no pet.); *General Dynamics v. Torres*, 915 S.W.2d 45, 49 (Tex. App.—El Paso 1995, writ denied). We examine the legal sufficiency of the evidence by considering whether the evidence at trial "would enable reasonable and fair-minded people to reach the verdict under review." *W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 898 (Tex. 2020). When conducting a factual sufficiency review, we do not substitute our judgment for the factfinder's and reverse only if the great weight and preponderance of the evidence demonstrates the factfinder's judgment was manifestly unjust. *Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019). When, as here, the trial court is not required to and does not make findings of fact or conclusions of law, it is implied that the trial court made all the necessary findings in support of its judgment. *Chicago Title Ins. Co.*

*v. Cochran Invs. Inc.*, 602 S.W.3d 895, 899 n.2 (Tex. 2020) (citing *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989) (per curiam)). In a bench trial, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

**B.      Did Kott have the authority to unilaterally execute the $350,000 note?**

Kott does not dispute that he had a personal interest in the $350,000 note, but instead he contends that Article 6.04 of MK Developers' regulations "waives any conflict of interest related to the company doing business with any member of the company." That article provides that MK Developers "may transact business with any Member, . . . provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties." Although this provision allows members to enter into business with MK Developers directly, it does not allow members to circumvent section 101.255's provisions for determining whether a transaction between an LLC and a governing member is valid. *See Marchiani v. Shadle*, No. 03-22-00484-CV, 2024 WL 3586022, at *4 (Tex. App.—Austin July 31, 2024, no pet.) (mem. op.) (company agreement authorizing fiduciary "to manage all affairs of the [company] without the approval, consent or other participation by any other . . . Member" did not relieve fiduciary of duty of loyalty). Kott separately points to certain meeting minutes from the company's records as proof that Kott had "broad powers . . . to conduct MK's business without the consent or signature of any other member." However, those minutes generally provide that Kott and Miller agreed that either party could act unilaterally on behalf of the company when conducting the company's affairs; they do not purport to expand either party's ability to enter into transactions directly with the company. Moreover, neither the

minutes nor the regulations purport to eliminate the fiduciary duties owed by the members to the company.

Importantly, a different article in the regulations provides additional rules for members attempting to advance funds as a loan to the company:

> 4.05 Advances by Members. If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so *with the Members' consent* may advance all or part of the needed funds to or on behalf of the Company. An advance described in this Section . . . constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, *and is not a Capital Contribution*.

(Emphases added). The articles further defined the term "General Interest Rate" to mean the lesser of "(a) [a] varying rate per annum that is equal to the interest rate publicly quoted by The Wall Street Journal from time to time as its prime commercial or similar reference interest rate . . . , and (b) the maximum rate permitted by law."

We interpret a limited liability company's regulations according to the well-established principles of contract construction. *Potter v. GMP, L.L.C.*, 141 S.W.3d 698, 700 (Tex. App.—San Antonio 2004, pet. dism'd). Thus, in interpreting the regulations, "[w]e consider the entire agreement and, to the extent possible, resolve any conflicts by harmonizing the agreement's provisions, rather than by applying arbitrary or mechanical default rules." *See Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 744 (Tex. 2020). Further, a specific contract provision controls over a general one. *Wal-Mart Stores, Inc. v. Xerox State & Loc. Sols., Inc.*, 663 S.W.3d 569, 587 (Tex. 2023).

9

Here, because Article 4.05 is specific to advancing funds, whereas Article 6.04 generally applies to any business transaction, Article 4.05 controls to the extent it conflicts with Article 6.04. *See id.* And to that end, Article 4.05 specifically requires "the Members' consent" when advancing funds directly to the company. Here, the evidence also shows that Kott signed the note on Miller's behalf, despite having no authority or consent from Miller to do so. Accordingly, we conclude that Kott did not have the authority to unilaterally execute the $350,000 promissory note. *See* Tex. Bus. & Com. Code § 3.403 ("[A]n unauthorized signature is ineffective except as the signature of the unauthorized signer in favor of a person who in good faith pays the instrument or takes it for value.").

**C.      Did Miller or MK Developers ratify the note and/or was the note unfair?**

Kott further contends that either Miller or MK Developers, or both, ultimately ratified the promissory note. "Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had a right to repudiate." *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021) (quoting *Wise v. Pena*, 552 S.W.2d 196, 199 (Tex. App.—Corpus Christi–Edinburg 1977, writ dism'd)). "Ratification may occur 'by express act or word,' or it 'may be inferred from a party's course of conduct.'" *Id.* (quoting *Motel Enters., Inc. v. Nobani*, 784 S.W.2d 545, 547 (Tex. App.—Houston [1st Dist.] 1990, no writ)). Parties seeking to establish ratification by course of conduct "must point to words or actions that 'clearly evidence an intention to ratify.'" *Id.* at 197–98 (citation modified). We look to the totality of the circumstances to determine whether an agreement has been ratified. *Id.* at 200.

10

To fall within the first of the two safe-harbor provisions under subsection 101.255(b) of the Business Organizations Code, Kott was required to show that the material facts of the transaction were disclosed to or known by Miller and that Miller approved the transaction. Tex. Bus. Orgs. Code § 101.255(b)(1). In support of his argument that Miller ratified the $350,000 note, Kott points to evidence that the note's existence was disclosed on the company's various financial records, even after he sold his interest in the company, that Miller received and retained interest payments from the $50,000 note, and that Miller has profited from the construction of the Pet Hotel. Disclosure of the note's existence does not unilaterally establish that the *material facts* underlying the transaction were disclosed to or known by Miller. *See id.* Indeed, although the $350,000 note appears in the company's financial records as a liability, some of its terms, such as the interest rate, repayment terms, and maturity date, do not appear anywhere other than in the note itself. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("In a contract to loan money, the material terms will generally be: the amount to be loaned, maturity date of the loan, the interest rate, and the repayment terms."). Even a diligent auditing of the company's books would not have necessarily revealed the material terms of the note, as MK Developers' payments on the $350,000 note were inconsistent, both in amount and in frequency. Although Kott testified that he informed Miller of the terms of the note, the trial court was not required to credit this testimony. *See McGalliard*, 722 S.W.2d at 696.

Miller testified that, while he knew of the $50,000 note, he had no knowledge of the $350,000 note's existence until after he attempted to sell other property belonging to MK Developers. Once Miller learned of the note, he brought suit to have it declared void. *See Land Title Co. of Dall., Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 757 (Tex. 1980) ("critical

factor" in determining ratification is party's "knowledge of the transaction and his actions in light of such knowledge"). Because the evidence establishes that Miller did not have knowledge of all material facts of the $350,000 note until he sued to stop its enforcement, we conclude that Miller did not ratify the note and therefore, subsection 101.255(b)(1) does not apply. *See* Tex. Bus. Orgs. Code § 101.255(b)(1); *Strickhausen*, 629 S.W.3d at 196; *Twenty First Century Holdings*, 2015 WL 1882267, at *4 (where evidence established managers of limited liability company were unaware of self-dealing transaction, subsection 101.255(b)(1)'s safe-harbor provision did not apply).

Under the second safe-harbor provision of Subsection 101.255(b) of the Business Organizations Code, the interested member must show that the self-dealing "transaction is fair to the company when the . . . transaction is authorized, approved, or ratified by the governing authority, a committee of the governing authority, or the members of the company." Tex. Bus. Orgs. Code § 101.255(b); *see Twenty First Century Holdings, Inc.*, 2015 WL 1882267, at *3. "The burden of proving that a transaction falls within this safe harbor rests on the interested" member. *See In re Estate of Poe*, 648 S.W.3d at 290 (citing Tex. Bus. Orgs. Code § 21.418). To successfully challenge the legal and factual sufficiency of the evidence on an issue on which he had the burden of proof, Kott must show either that the evidence conclusively established the opposite of the trial court's finding or that the trial court's finding was so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Adam v. Marcos*, 620 S.W.3d 488, 505–06 (Tex. App.—Houston [14th Dist.] 2021, pet. denied).

We have previously used the dictionary definition of the term "fair" to construe its meaning in subsection 101.255(b)(2). *Twenty First Century Holdings*, 2015 WL 1882267, at *4. Thus, for a self-dealing transaction to be "fair," it must be free from fraud, injustice,

prejudice, or favoritism, and be characterized by honesty and justice. *Id.* (citing *Webster's Third New Int'l Dictionary* 815 (2002)). As discussed above, the evidence shows that Kott executed the note by signing Miller's name without Miller's consent, and with terms that were not disclosed to or authorized by Miller. Although Kott testified that the note was intended to balance the parties' respective capital contributions, the company's regulations prohibited capital contributions in the form of cash advances.

Moreover, in the years before the execution of the $350,000 note, 195 Lumber sent several invoices to MK Developers, totaling $130,122.46. Kott testified that he would record these invoices on MK Developers' books "[a]s if he paid" them from his capital account, reflecting mirrored capital contributions from Kott in the amount of $130,122.46. But, in reality, Kott either never satisfied these invoices or did not do so until he was court-ordered to pay restitution. In other words, the difference between Kott's capital contributions and Miller's contributions as of the date of the $350,000 and $50,000 notes' execution was illusory. Given the fabrications in MK Developers' books, the alleged "balancing" of each member's capital contributions, as Kott testified these separate notes were intended to do, would have been better achieved by issuing a $208,000 note made payable to Kott and a $192,000 note made payable to Miller.[5] Better yet, given the evidence indicating the true cost of constructing the Pet Hotel was

---

[5] A capital account summary attached to MK Developers' 2011 IRS Form 1065 reflects that Kott began the year with a total in capital contributions of $457,684 and Miller began with a total of $299,357. The return does not reflect that the promissory notes were claimed as capital contributions by either party for that year; rather, the note reflects that Kott withdrew $125,106 from his capital account and Miller contributed $20,000 during 2011. According to the summary, Kott and Miller ended 2011 with net capital contributions of $296,465 and $283,244, respectively.

To calculate the figures reached above, we began by subtracting $130,122.46, the amount in fictitious capital payments made by Kott to 195 Lumber, from $457,684, the starting amount

13

closer to $285,000, the notes should have been in amounts of $148,200 and $136,800, respectively.[6] Thus, based on the evidence before it, the trial court could have concluded that MK Developers owed Kott more money, and its interest payments to Kott were larger under the $350,000 note than under a more equitable $148,200 note. Given the lack of adequate consideration and the elements of fraud underpinning the transaction, we conclude that the evidence was sufficient to support the trial court's implied finding that the $350,000 note was unfair to MK Developers. *See* Tex. Bus. Orgs. Code § 101.255(b)(2); *Twenty First Century Holdings*, 2015 WL 1882267, at *4. We further conclude that, since neither of the safe harbor provisions of subsection 101.255(b) applies to Kott's actions, the trial court did not err by determining that the $350,000 note was void. *See* Tex. Bus. Orgs. Code § 101.255(b)(2); *Twenty First Century Holdings*, 2015 WL 1882267, at *4.

## III.   CONCLUSION

We affirm the trial court's judgment.

---

of Kott's capital contributions for 2011. Without including the $130,122.46 in payments to 195 Lumber, we determined that Kott's capital contributions at the beginning of 2011 were $327,561.54. We then assigned percentages to each party's capital contributions as of the beginning of 2011 and determined that Kott's and Miller's respective capital contributions were approximately 48% and 52%, respectively, of the total amount in net capital contributions. We then multiplied these percentages by $400,000 to calculate the approximate amount necessary to balance the parties' capital contributions in 2011.

[6] We used the same percentages discussed in footnote five to reach these figures.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Theofanis and Ellis

Affirmed

Filed:   November 21, 2025